JOURNAL ENTRY and OPINION
{¶ 1} The appellant-juvenile, D.B., asserts that the manifest weight of the evidence does not support his adjudications of delinquency for rape and kidnaping. Having reviewed the entire record, we cannot say that the juvenile court clearly lost its way or created such a manifest miscarriage of justice that the adjudications must be reversed. Accordingly, we affirm.
 Procedural History {¶ 2} The complaint in this case was filed on November 10, 2003, and alleged that appellant was delinquent because he committed a rape in violation of R.C. 2907.02(A)(2) and kidnaping in violation of R.C.2905.01(A)(4). The court conducted an adjudicatory hearing on March 31, 2004.
 {¶ 3} At the hearing, the court first heard the testimony of the victim, S.C., who was age 16 at the time of the hearing. She testified that, in September 2002, she had been a foster child at the home of Martha Lauderdale for a couple of months. She, appellant and "Andy" were in the kitchen at Ms. Lauderdale's house, talking and laughing, for 45 minutes to an hour one evening. Appellant and Andy were Ms. Lauderdale's grandsons. Appellant and Andy told S.C. to go to the garage and to sit down on the couch. She did. Andy then held her down by the shoulders while appellant pulled down the pants of her white jogging suit and "they had intercourse with me." Immediately afterward, she went to her room and locked the door. S.C. reported that appellant told her that he had "done this to many other foster kids that my grandmother had, and if you tell somebody * * * I will come after you."
 {¶ 4} S.C. did not tell anyone until two days later, when she told a teacher about the rape. Three or four days after the rape, she talked to her friend "Richard" about it on the telephone. Ms. Lauderdale overheard her conversation and told her to "[g]et off my phone you liar." Ms. Lauderdale then called S.C.'s social worker, Jeffrey Perkins. S.C. spoke with her social worker, a police officer, a therapist, and her guardian ad litem about the events. Shortly thereafter, she was placed at Laurelwood Hospital.
 {¶ 5} On cross-examination, S.C. reported that she had been sexually assaulted by two others in the past. She testified that her uncle sexually abused her then committed suicide in front of her. She also testified that her aunt's boyfriend sexually assaulted her "almost every day" "from the time I was six to the time I was twelve." He was convicted and spent some time in prison.
 {¶ 6} Paul Sturman, an investigator for the Cuyahoga County Department of Children and Family Services ("CCDCFS"), testified that he interviewed S.C. on November 20, 2003 [sic] and also spoke with the police. The statement S.C. gave him was similar to the statement she gave to police. Sturman prepared an investigation report, which was introduced into evidence as state's exhibit 1. The investigation was completed on June 3, 2003, and concluded that the complaint was "indicated," that is, it was a "credible disclosure without supporting evidence."
 {¶ 7} Detective Alan Strickler of the Cleveland Police Sex Crimes and Child Abuse Unit testified that this matter was assigned to him on December 9, 2002, after the previous investigating officer was promoted. He interviewed S.C. on January 13, 2003, and also spoke to Ms. Lauderdale.
 {¶ 8} Martha Lauderdale testified that S.C. moved into her home on September 9, 2003 [sic]. She overheard S.C. on the telephone on a Monday, laughing and saying that she was going to be "out of here soon." Ms. Lauderdale asked her what had happened, and S.C. told her that appellant "had allegedly raped her" the preceding Saturday. Ms. Lauderdale contacted S.C.'s social worker. She denied that she spoke with appellant or Andy about S.C.'s allegations. She said that police came and took the clothing S.C. had been wearing, which had not been laundered yet.
 {¶ 9} Jeffrey Perkins, S.C.'s social worker, testified that S.C. called him twice about this incident; the second call came on October 1, 2002. He understood that the incident had occurred on the preceding Saturday. He saw her on October 3. S.C.'s statements on the telephone and in person were consistent. Perkins also spoke with Ms. Lauderdale, who told him she had spoken with her grandsons about the incident. Perkins was aware that S.C. had previously been hospitalized because of psychiatric concerns while she was in another foster placement.
 {¶ 10} Appellant and Maylynn Lauderdale testified on appellant's behalf. Maylynn Lauderdale testified that she lived upstairs from her mother, Martha Lauderdale. She testified that she left for work at approximately 8:45 or 9:00 p.m. and saw appellant, Andy and S.C. in the kitchen at that time. She also testified that the garage door was stuck in the up position at the time of this incident, so that anyone walking or driving could have seen in. Appellant denied that he raped S.C. He denied that he and Andy were in the garage that evening.
 {¶ 11} Following the adjudication hearing, the court adjudged appellant delinquent by reason of having committed rape and kidnapping, and referred him for evaluation as to whether he should be classified as a juvenile sex offender. A dispositional hearing was held on April 27, 2004, at which the court committed the appellant to the custody of the Ohio Department of Youth Services for a minimum of twelve months, and determined that it had a duty to classify him as a juvenile sex offender registrant, pursuant to R.C. 2152.83(A)(1).
 Law and Analysis {¶ 12} Appellant argues that the adjudication of delinquency is against the manifest weight of the evidence. In reviewing this argument, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, "in resolving conflicts of evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed and a new trial ordered." Statev. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52.
 {¶ 13} Appellant asks us to note the lack of physical evidence and the lack of witnesses to the events. The lack of physical evidence is not surprising. The victim did not report the incident until several days afterward, so any evidence on her body would have been destroyed. Furthermore, the victim did not know whether appellant ejaculated; there was not necessarily any trace evidence which should have been recovered from her clothing. The lack of witnesses to a rape also is not surprising.
 {¶ 14} The evidence in this case consists of the victim's statements. The victim has consistently made the same statements about what happened over time to a number of different persons. This is an indication of her credibility. Neither the victim's history of psychiatric hospital admissions nor her history of sexual abuse undermines her credibility, as appellant appears to argue. An adult male previously was convicted for having sexually abused her; her claims of prior abuse were not mere unsubstantiated accusations. Hospital admissions do not, per se, have any relationship to credibility.
 {¶ 15} We cannot say that the trial court clearly lost its way and created a manifest miscarriage of justice by adjudicating appellant delinquent. Therefore, we affirm.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile court division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Karpinski, P.J. and Gallagher, J. Concur.